# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

SHANNON ANKNEY,            )
)   No. 12 CV 1841
            Plaintiff,     )
)
    v.                )   Magistrate Judge Young B. Kim
)
CAROLYN W. COLVIN, Acting   )
Commissioner, Social Security   )
Administration,[1]          )
)   August 1, 2013
          Defendant.    )

## MEMORANDUM OPINION and ORDER

Shannon Marie Ankney seeks disability insurance benefits ("DIB") and Supplemental Security Income ("SSI") on the basis of her claim that she is unable to work because of numerous emotional and physical impairments. After her application was denied by the Commissioner of the Social Security Administration ("Commissioner"), Ankney filed this suit seeking judicial review. *See* 42 U.S.C. § 405(g). Currently before the court is Ankney's motion for summary judgment seeking reversal of the Commissioner's decision, and the Commissioner's cross-motion for summary judgment seeking affirmation of its decision. For the following reasons, Ankney's motion is granted and the Commissioner's cross-motion is denied:

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), Carolyn W. Colvin—who became the Acting Commissioner of Social Security on February 14, 2013—is automatically substituted as the named defendant.

## Procedural History

Ankney applied for DIB and SSI on July 1, 2008, claiming that she became unable to work on February 1, 2008. (Administrative Record ("A.R.") 165-69.) After her claims were denied initially and upon reconsideration, (id. at 73-80), Ankney sought and was granted a hearing before an administrative law judge ("ALJ"), (id. at 83-87). The ALJ held a hearing on October 21, 2010, at which Ankney and a vocational expert ("VE") provided testimony. (Id. at 28-70.) On November 15, 2010, the ALJ issued a decision finding that Ankney is not disabled within the meaning of the Social Security Act and denying her benefits. (Id. at 9-23.) When the Appeals Council denied her request for review, (id. at 1-3), the ALJ's denial of benefits became the final decision of the Commissioner, *see O'Connor-Spinner v. Astrue*, 627 F.3d 614, 618 (7th Cir. 2010). On March 3, 2012, Ankney filed the current suit seeking judicial review of the Commissioner's decision. *See* 42 U.S.C. § 405(g). The parties have consented to the jurisdiction of this court. *See* 28 U.S.C. § 636(c).

## Facts

Ankney, who currently is 32 years old and the mother of one daughter, has a long history of drug abuse and emotional problems (anxiety, depression, bipolar disorder, and attention deficit hyperactivity disorder ("ADHD")), as well as physical pain stemming from a car crash in 2008 (fractured shoulders and a broken ankle, among other injuries). She does not have a driver's license or a car and has not held a job since 2008. She stopped attending school regularly after the eighth grade. She reads at a fifth-grade level and has an IQ of 75. Ankney claims that she is

unable to work on account of her medical and emotional problems.  At the hearing before an ALJ, Ankney presented both documentary and testimonial evidence in support of her claim.

## A.    Medical Evidence

### 1.    Mental Health Treatment

The medical record begins in January 2008 when Ankney arrived at a Michigan emergency room seeking help for drug addiction.  (A.R. 252-57.)  Medical personnel transferred her to the hospital's addictions unit, at which point Dr. David Guffey performed a psychiatric evaluation.  (Id. at 244-47.)  During this evaluation, Ankney admitted to a seven-year addiction to Vicodin and Lortab and to daily use of marijuana.  (Id. at 244.)  She confided to Dr. Guffey that her mother is a drug addict, that her father is a recovering alcoholic, that her family has a strong history of mental illness, and that she too has suffered from depression since 2002.  (Id. at 244-45.)  She also explained to Dr. Guffey that her mother was jailed when she was 5 years old, that she ran away from home when she was 13 years old and lived on the street at times, and that her home life was so chaotic that she did not take school seriously.  (Id. at 245.)  Dr. Guffey noted Ankney's withdrawal symptoms of sweating, chills, nausea, and poor appetite and sleep.  (Id. at 246.)  At the same time, he noted that she was well-groomed, cooperative, pleasant, coherent, alert, euthymic (non-depressed), and in no acute distress.  (Id.)  Ankney stayed at the addictions unit for three days.  (Id. at 249.)  Upon discharge, medical staff noted that she was awake, alert, and cooperative, but anxious.  (Id.)

After her discharge, Ankney received medication and periodic check-ups from Nurse Practitioner Susan Michalowski. Nurse Michalowski administered a psychiatric evaluation, during which Ankney admitted to having had suicidal thoughts and to having attempted suicide. (Id. at 265.) She reported feeling anxious, panicky, sad, angry, irritable, unable to sleep, and to having low self-esteem. (Id. at 264.) She also admitted to breaking into homes as an adolescent to support her marijuana habit and to cashing a fake check in 2001, both of which led to her arrest. (Id. at 267.) Her diagnoses were listed as major depression, panic disorder, opioid dependency in partial remission, antisocial personality traits, and possible bipolar disorder. (Id. at 271.) Over the course of the next year or so, Nurse Michalowski prescribed a number of different medications to help alleviate Ankney's symptoms, including Zyprexa, Seroquel, Clonidine, Ambien, and Lamictal. (Id. at 258-63, 300-02.)

Dr. Robert Fabiano evaluated Ankney in August 2008 and completed a full psychological report. (Id. at 272-75.) He found her to be punctual and well-groomed but also depressed, anxious, and with limited conversational skills. (Id. at 272.) He noted poor eye contact, poor self-confidence, and a blunted affect. (Id.) A full spectrum of clinical testing revealed an IQ of 75 and "significant limitations across all areas of intellectual functioning." (Id. at 273.) His diagnostic impressions were bipolar disorder, ADHD, borderline intellectual functioning, psychological stressors,

and a Global Assessment of Function ("GAF") score of 50.[2]  (Id. at 275.)  Dr. Fabiano noted that Ankney "will perform best with tasks which are relatively simple and repetitive."  (Id.)  He recommended cognitive-behavioral therapy to increase her productive behavior as she demonstrated a "significant degree of dependency and very limited feelings of self-confidence and self-worth."  (Id. at 274-75.)

The State of Michigan Department of Social Services authorized Dr. Steve Geiger to evaluate Ankney on September 3, 2008.  (Id. at 276-80.)  Ankney reported to Dr. Geiger that she was addicted to opiates, Vicodin, morphine, and Demerol.  (Id. at 277.)  She also stated she never had a problem with alcohol or marijuana, although she confided that she "skipped school to smoke weed."  (Id.)  Ankney denied ever attempting suicide, although she admitted to suicidal ideation.  (Id.)  She reported difficulties with sleeping and eating, fatigue, panic attacks, problems with her concentration and memory, a loss of interest in life activities, and feelings of hopelessness, worthlessness, and guilt.  (Id.)  Dr. Geiger observed Ankney "to be depressed, anxious, angry and emotionally flat," although she also appeared to have good contact with reality.  (Id. at 278-79.)  He diagnosed her as having a mood disorder NOS (not otherwise specified), a panic disorder without agoraphobia, opioid dependence (early full remission), and antisocial traits.  (Id.)  He also noted

---

[2] The GAF scale ranges from zero to 100 and is a measure of an individual's "psychological, social and occupational functioning on a hypothetical continuum of mental health-illness."  American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 34 (4th ed, Text Rev. 2000) ("DSM-IV-TR").  A GAF score of 41-50 indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)."  DSM-IV-TR at 34.

that he needed to rule out ADHD and OCD. (Id.) He listed her prognosis as guarded and assigned a GAF score of 53.[3] (Id.)

Also in September 2008, non-examining state agency psychologist Dr. Leonard Balunas completed a Psychiatric Review Technique form based on the reports of Dr. Geiger and Dr. Fabiano. (Id. at 282-99.) Based on these reports, Dr. Balunas concluded that Ankney has a mood disorder, an anxiety-related disorder, and a substance abuse disorder. (Id. at 282.) He opined that she has a mild limitation in performing activities of daily living and maintaining social functioning, and in understanding and remembering detailed instructions. (Id. at 292, 296.) He found moderate limitations in maintaining concentration, persistence, or pace, and in the ability to respond appropriately to changes in the work setting. (Id.) Otherwise, he did not find her to be significantly limited in any areas. (Id.) In sum, he found that Ankney "is able to perform unskilled work involving 1 and 2 step instructions with limited need for sustained concentration and only occasional changes in the work setting." (Id. at 298.)

The following month, in October 2008, Ankney sustained serious injuries from a car accident, including fractured shoulders, damage to her knee, a broken ankle requiring stabilizing pins and screws, and a brain hemorrhage. The medical record does not contain treatment notes from the actual hospital stay. Information

---

[3] A GAF score of 51-60 indicates "[m]oderate symptoms (e.g. flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." DSM-IV-TR at 34.

about the accident comes from comments Ankney made to mental health professionals that were memorialized in their notes.

Several months after the car accident, in 2009, Ankney relocated from Michigan to Chicago and sought treatment at Northwestern University Hospital's outpatient clinic. She found her way to the clinic on her own after running out of some of her medications. (Id. at 392.) Dr. Sajoy Varghese performed an initial assessment and listed as a "precipitating factor" Ankney's "[n]on-compliance with medications" and "[p]sycho stimulant abuse induced mood lability, questionable substance abuse." (Id. at 397.) He listed as a "perpetuating" factor the "[c]ontinuous non-compliance [v]ersus abuse of medications." (Id.) He found her to have the capacity to make a reasoned decision about her treatment, and he discredited her account of a suicide attempt as "inconsistent." (Id.) As for her mood at the time of the evaluation, he found her to be "calm, pleasant, cooperative, reporting anxiety attacks but does not appear restless, diaphoretic or tremulous." (Id.) She was not suicidal; to the contrary she was "future oriented and looking forward to starting a new chapter in her life with her boyfriend in Chicago." (Id.) His diagnoses included mood disorder NOS, possible bipolar II disorder, and possible stimulant abuse. (Id.) Dr. Varghese then prescribed Prozac, Neurontin, Zoloft, Lithium, Seroquel, and Adderall. (Id. at 395.)

Beginning in October 2009, Dr. Elizabeth McIlduff became Ankney's primary medication management doctor. Over the ensuing months, Dr. McIlduff tried different medications to address Ankney's symptoms and on occasion discontinued

medications where they were ineffective or had intolerable side effects.  (Id. at 380, 386.)  Dr. McIlduff strongly advised Ankney to enlist in weekly therapy sessions, as opposed to only checking in monthly for medication checks, because she felt several of Ankney's symptoms "appear[ed] to be personality based."  (Id. at 371.)  Ankney reported that she had no side effects from her psychiatric medications and felt she was responding well to them.  (Id.)

In May 2010, Dr. McIlduff issued a "Final Report" (although she continued to treat Ankney), in which she reported that Ankney complained of trouble sleeping, panic attacks, trouble concentrating, and racing/negative thoughts, but that she had better impulse control, was less agitated, and expressed an interest in starting therapy.  (Id. at 361-62.)  She was well-groomed, cooperative with good eye contact, and displayed normal speech and movement.  (Id. at 361.)  In June 2010, Dr. McIlduff performed an annual assessment, noting complaints of anxiety, depression, poor impulse control, and antisocial traits.  (Id. at 357.)  Ankney also expressed disgust with her appearance and said she spends much of the day trying to cover her face with make-up.  (Id. at 358.)  The report lists the diagnoses of bipolar type II, panic disorder, possible body dysmorphic disorder, OCD, ADHD, and possible post-traumatic stress disorder, and a GAF score of 60.  (Id. at 359.)

Ankney checked in with Dr. McIlduff once a month during the summer of 2010, and the treatment notes from these visits reflect good days and bad days.  (Id. at 324-60.)  Sometimes Ankney complained of panic attacks, feeling "awful," and wanting people to leave her alone.  (Id. at 331.)  Other times, she stated that her

mood had improved since her last visit, that she had no depressive symptoms, and that she had no side effects from her medications.  (Id. at 341.)  Her GAF score in August 2010 was 50.  (Id. at 343.)  In September 2010 a therapist was assigned to work with her, (id. at 333), although Ankney expressed an inability to start therapy until the following month because of transportation problems.  (Id. at 325, 333.)

Dr. McIlduff completed a Mental Residual Functional Capacity Questionnaire in September 2010.  (Id. at 320-23.)  She noted that she had seen Ankney every four to six weeks for medication management for almost a year.  She provided the following diagnoses:  bipolar type II, generalized anxiety disorder with panic attacks, and possible ADHD.  (Id. at 320.)  She also listed chronic pain, unemployment, relationship stress, and limited social support as other stressors. (Id.)  She assigned a GAF score of 50.  (Id.)  Dr. McIlduff noted that Ankney's "mood has become more stable with treatment with less anger outbursts and no suicidal thoughts."  (Id. at 320.)  She noted that Ankney continues "to suffer from poor sleep (1-5 hours a night), irritability, anxiety, and panic attacks."  (Id.)  Dr. McIlduff noted that Ankney's lack of sleep "can exacerbate [the] perception of physical pain." (Id. at 322.)  For a prognosis, Dr. McIlduff stated:  "Bipolar Disorder is a chronic, episodic illness which will require life-long treatment."  (Id. at 321.)  She found a marked restriction in Ankney's activities of daily living, social functioning, and concentration, persistence, and pace.  She opined that Ankney would be absent from work more than four days per month because of her mental health problems.  (Id. at 322.)

## 2.     Pain Treatment

In February 2010, Ankney saw Dr. Carlos Smith, a podiatrist, complaining of shooting pain in the talus of her left foot and wanting to have the surgical screws in her ankle removed.  (Id. at 316.)  Dr. Smith noted that "the severity of the condition is moderate."  (Id.)  He further noted +1/5 edema in her left foot, as well as painful hardware in the left foot and painful arthralgia in the subtalar joint.  (Id. at 317.) Surgery was discussed, as well as possible surgical outcomes.  (Id.)

In March 2010 Ankney sought treatment from a different podiatrist, Dr. Malcolm Herzog.   At the first of six appointments with Dr. Herzog, Ankney described the specifics of her 2008 car crash and complained of shooting pain in her ankle, back, and shoulder.  (Id. at 430.)  She stated she could only walk 200 feet before needing to rest.   (Id.)   Dr. Herzog opined that Ankney suffers from progressive post-traumatic arthritis that might require a joint fusion and likely will cause chronic pain.  (Id. at 431.)  Dr. Herzog also sent Ankney for an MRI of her ankle and mid-tarsus.   The physician interpreting the MRI scan reported that "[a]lthough the visual findings are limited, the ankle mortis reveals no progressive degenerative arthritic changes, no osteochondral lesion, and no narrowing of the joint space."  (Id. at 434.)  The physician also reported that, "[t]he subchondrial bone plate of the calcaneus reveals very significant sclerosis at the posterior facet raising suspicion of early developing post traumatic degenerative osteoarthropathy of the subtalar joint."  (Id. at 434-35.)

In May 2010 Ankney saw pain specialist Dr. Xavier Pareja for treatment of pain in her lower back, left shoulder, right knee cap, and left foot.  (Id. at 419-21.) Dr. Pareja described Ankney as "well developed, well nourished, [and] in no acute distress."  (Id. at 420.)  During the physical exam, Dr. Pareja noted that Ankney's right shoulder, right knee, and back were tender to the touch but that her range of motion and flexion were good.  (Id.)  He ordered an MRI of her lumbar spine and thoracic spine.  (Id. at 420, 422-23.)  The MRI of her thoracic spine showed no abnormalities, while her lumbar spine scan revealed a protrusion at L5/S1, and her shoulder evidenced mild degeneration of the acromioclavicular joint.  (Id. at 422-24.) Ankney had two follow-up visits with Dr. Pareja, during which he prescribed various medications to address her complaints of pain.  (Id. at 414-18.)

In May, June, July, and October 2010, Dr. Herzog met with Ankney to discuss her pain and her appointments with Dr. Pareja.  (Id. at 432-33.)  Ultimately, Dr. Herzog told her that she would never be in as good condition as she was prior to her accident and that in his opinion "she will continue to develop a more severe post traumatic arthritis which is progressive in nature, in her foot and ankle, which could again potentially lead to an ankle fusion in the future."  (Id. at 433.)  He concluded that "it is my opinion and belief that the patient is disabled to the extent where she cannot work and she has great difficulties in carrying out her normal day to day activities.  In addition, the patient is suffering [from] post traumatic arthritis of the left foot and ankle.  There is a high probability that the patient will require an ankle fusion in the future.  I recommend permanent disability."  (Id.)  Dr. Herzog

also completed a Medical Source Assessment in which he rated her prognosis as "poor." (Id. at 426.) He found her incapable of even a "low stress" job and unable to walk even a block without severe pain. (Id. at 427.) He believed she only has "bad" days and that she "is unable to work in any job currently and her condition will worsen with time." (Id. at 428-29.)

## B.    Ankney's Testimony

At the hearing, Ankney described the nature of her physical and emotional problems and their limiting effects, as well as her troubled childhood and legal difficulties. (Id. at 34-37.) She testified that she has had only part-time work as a waitress or bartender. (Id. at 38.) Her most recent job in 2008 ended when she blacked out as a result of her bipolar medications. (Id. at 38, 41.) She described taking Zoloft for depression back in 2003 and then seeking out a medical professional after her car accident to help her with her bipolar disorder, ADHD, and insomnia. (Id. at 39-40.) She testified that the only condition she has under control now is her self-destructiveness. (Id. at 43.) She said that her foot is swollen and painful and needs to be stretched out. (Id. at 53.) She can only stand on her left foot for five minutes as she can feel the surgical pins pushing out and she testified that the pain is "excruciating." (Id. at 54.) She was going to get the screws out and had checked into the hospital to do so, but then [Dr. Smith] called and cancelled the procedure. (Id. at 54-55.) She constantly needs to shift positions because of her back pain. (Id.) She does not like to take too much medication on account of her daughter. She takes just enough to take the edge off her pain and alleviate her

irritability.  (Id. at 55-56.)  She finds it difficult to carry more than a few pounds and cannot carry anything in her right hand because of her shoulder injury.  (Id. at 52-53.)  She is depressed and described her day as "an emotional roller coaster" where she starts off happy but then progresses to sadness, depression, anger, pain, and sleeplessness.  (Id.)  Her appetite is poor.  (Id. at 58.)  She worries about her parents, has racing thoughts, has trouble getting along with others, and cannot bear people standing too close to her or "breath[ing] down [her] neck."  (Id. at 49, 59.)  She either has been fired from or has quit most of her jobs.  (Id.)  She does not socialize and relies on others to care for her daughter on weekends.  (Id.)  She has panic attacks several times a day and has trouble focusing to the point where she can barely help her daughter with her homework or play a game with her.  (Id. at 60-61.)  Her physical pain also makes it hard to sit with her daughter for very long. (Id.)  She does not have any hobbies and does not watch television.  (Id. at 52.)  She devotes much of her day, every day, to taking care of her apartment and her daughter.  (Id. at 44-45.)  She cooks simple meals and gets her daughter off to school, although the two-block walk to school is too far for her to go without stopping because of pain.  (Id. at 46, 54.)  She needs constant breaks when doing household chores such as cooking and laundry.  (Id. at 63.)  She only leaves her apartment to go to the doctor or to take her daughter to school.  (Id. at 63-64.)

## C.    The Vocational Expert's Testimony

Richard Hamersma, Ph.D., testified regarding the kinds of jobs someone with certain hypothetical limitations could perform.  (Id. at 65-70.)  His hypothetical

assumed a younger individual with limited education and no past relevant work who could lift and carry no more than 20 pounds occasionally and 10 pounds frequently; could stand and walk about four hours in an eight-hour workday; could sit about six hours with normal rest periods; is unable to understand, remember or carry out detailed and complex job instructions; is unable to do work requiring intense focus and concentration for extended periods; can only have limited contact with the general public; and is moderately limited in her ability to respond to changes in the work setting. (Id. at 65-66.) With these limitations and parameters in mind, assuming a sedentary level of work, the VE testified that three jobs exist in significant numbers in the Chicago metropolitan area: hand packager, assembly positions, and inspection jobs. (Id. at 66.) Ankney's attorney asked the VE to look at the reports of Dr. Herzog and Dr. McIlduff and opine as to whether the restrictions in those documents would affect the ability to do the suggested jobs. (Id.) The VE responded that the application of those restrictions would eliminate the suggested jobs. (Id. at 66-67.) The jobs also would be eliminated by the individual having panic attacks about three times a day. However, the suggested jobs do not require intense focus or concentration so that an individual with a lack of focus still could conceivably perform them. (Id. at 67.) The individual also could work while seated and stand as needed, provided the worker stays on task. (Id. at 68-69.)

**D.    The ALJ's Decision**

The ALJ concluded that Ankney is not disabled under sections 216(i), 223(d), and 1614(a)(3)(A) of the Social Security Act.  (Id. at 12.)  In so finding, the ALJ applied the standard five-step sequence, *see* 20 C.F.R. § 404.1520(a)(4), which requires him to analyze:

> (1) whether the claimant is currently employed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment is one that the Commissioner considers conclusively disabling; (4) if the claimant does not have a conclusively disabling impairment, whether [s]he can perform [her] past relevant work; and (5) whether the claimant is capable of performing any work in the national economy.

*Kastner v. Astrue*, 697 F.3d 642, 646 (7th Cir. 2012).  If at step three of this framework the ALJ finds that the claimant has a severe impairment that does not meet or equal one of the listings set forth by the Commissioner, he must "assess and make a finding about [the claimant's] residual functional capacity based on all the relevant medical and other evidence."  20 C.F.R. § 404.1520(e).  The ALJ then uses the residual functional capacity ("RFC") to determine at steps four and five whether the claimant can return to her past work or to different available work.  *Id.* at § 404.1520(f), (g).

Here, at step one of the analysis, the ALJ determined that Ankney met the insured status requirements through September 30, 2012, but that she has not engaged in substantial gainful activity since the application date of February 1, 2008.  (A.R. 14.)  At step two, he found that she suffers from the following serious impairments:  "affective disorder, anxiety related disorder, history of substance

abuse, and posttraumatic osteoarthritis of the left ankle status post open reduction with internal fixation." (Id.) The ALJ noted that Ankney does have a small disc protrusion at the L5-S1 level of her lumbosacral spine, but he declined to classify it as a severe impairment. (Id.) At step three, the ALJ declined to find that Ankney has an impairment or combination of impairments that meet or medically equal one of the listed impairments. (Id. at 15.) At step four, he found that she has the RFC to perform light work, except that she "can only stand/walk for about four hours in an eight-hour workday; is unable to understand, remember, and carry out detailed and complex job instructions; is unsuited for work requiring intense focus and concentration for extended periods; i[s] moderately limited in the ability to respond appropriately to changes in the work setting; and is limited to only occasional contact with the general public." (Id. at 16.) At step five, the ALJ adopted the VE's testimony and found that Ankney's RFC allows her to work as an assembler, hand packager, or inspector. (Id. at 22.) Accordingly, the ALJ concluded that Ankney is not under a disability as defined by the Social Security Act and denied her application for benefits. (Id. at 23.)

## Analysis

In her motion for summary judgment, Ankney makes three challenges to the ALJ's decision. First, she argues that the ALJ improperly discounted the opinions of Ankney's treating physicians, Drs. Herzog and McIlduff. Second, she maintains that the ALJ erred in finding that she has the RFC to perform light work. Third, she contends that the ALJ improperly assessed her credibility. Of these challenges,

the court agrees with Ankney that the ALJ improperly discounted Dr. McIlduff's opinion and that the RFC analysis fails to meet the substantial evidence standard.

This court's role in disability cases is limited to reviewing whether the ALJ's decision is supported by substantial evidence and is free of legal error. *See Scheck v. Barnhart*, 357 F.3d 697, 699 (7th Cir. 2004). Substantial evidence is that which "a reasonable mind might accept as adequate to support a conclusion." *McKinzey v. Astrue*, 641 F.3d 884, 889 (7th Cir. 2011) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). The substantial evidence standard requires the ALJ to build a logical bridge between the evidence and his conclusion, but not necessarily to provide a thorough written evaluation of every piece of evidence in the record. *See Pepper v. Colvin*, 712 F.3d 351, 362 (7th Cir. 2013). In asking whether the ALJ's decision has adequate support, this court will not reweigh the evidence or substitute its own judgment for the ALJ's. *Shideler v. Astrue*, 688 F.3d 306, 310 (7th Cir. 2012). The court must affirm the ALJ's decision if reasonable minds could differ regarding whether the claimant is disabled. *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007). But remand is warranted if the ALJ's decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review." *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).

## A.    Dr. Herzog's Opinion

The ALJ afforded Dr. Herzog's opinion little weight and criticized his treatment notes as being "long on descriptions of the claimant's reports of pain and his dire predictions of what would likely occur in the future but short on objective

findings." (A.R. 21.) He further noted that Dr. Herzog served as Ankney's treating podiatrist "for a relatively short period of time" prior to rendering his opinion. (Id.) Finally, he discounted Dr. Herzog's conclusion that Ankney is "disabled to the extent where she cannot work" as an improper intrusion into the Commissioner's realm. (Id. at 20-21.) Ankney now argues on appeal that the ALJ erroneously failed to give Dr. Herzog's report controlling weight.

As a "treating source," Dr. Herzog's opinion is entitled to controlling weight, provided it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in [the] case record. *See* 20 C.F.R. § 404.1527(d)(2). An ALJ may discredit a treating source's medical record, however, if it is internally inconsistent or inconsistent with the opinion of a consulting physician—provided the ALJ minimally articulates his reason for crediting or rejecting evidence of disability. *Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004). A decision to deny controlling weight to a treating source's opinion does not prevent the ALJ from considering it; the ALJ may still look to the opinion, even after opting to afford it less evidentiary weight. Exactly how much weight the ALJ affords depends on a number of factors, such as the length, nature, and extent of the physician's and claimant's treatment relationship, whether the physician supported his or her opinions with sufficient explanations, and whether the physician specializes in the medical conditions at issue. *See* 20 C.F.R. § 404.1527(d)(2)(i)-(ii), (d)(3), (d)(5).

In this case, Dr. Herzog saw Ankney six times over the seven-month period immediately preceding the hearing. (A.R. 430-33.) The ALJ articulated the short span of overall treatment time as one reason for minimizing the weight to be given to Dr. Herzog's report, and this court finds no error here. During those seven months, Dr. Herzog saw Ankney monthly and took copious notes about her subjective complaints of pain. He also examined and x-rayed her ankle, referred her for an MRI and a nerve conduction study, and referred her to a pain specialist who independently prescribed pain medication. But critically, Dr. Herzog himself took no action aimed at actually treating Ankney's ankle. As of the date of the hearing, Dr. Herzog had yet to remove the hardware from Ankney's ankle,[4] nor had he referred Ankney for physical therapy to strengthen and/or loosen her ankle. (Id. at 21.) Dr. Herzog suggested ankle fusion surgery as a possibility for the future, but this surgery also has not taken place. In other words, as of the date of the hearing, despite numerous office visits with Dr. Herzog, Ankney had yet to undergo a single physical therapy session or procedure aimed at alleviating the pain in her ankle. This fact, along with Dr. Herzog's futuristic bent about what Ankney *may* require down the line, supports the ALJ's conclusion that Dr. Herzog's treating relationship with Ankney lacked sufficient longevity to merit controlling weight. *See id.* at § 404.1527(d)(2)(i) (stating that "[w]hen the treating source has seen you a number of

---

[4] Dr. Herzog advised Ankney on two separate occasions that he could remove the screws from her ankle. (A.R. 431-32.) Ankney declined, although she indicated at the hearing that Dr. Herzog still promotes the surgery. (Id. at 43.) Ankney had no obligation to undergo surgery, but 20 C.F.R. § 416.930(a) makes clear that "[i]n order to get benefits, you must follow treatment prescribed by your physician if this treatment can restore your ability to work."

times and long enough to have obtained a longitudinal picture of your impairment, we will give the source's opinion more weight").

The ALJ also found that Dr. Herzog's treatment notes and medical assessment lacked support from objective medical findings. The court agrees. Dr. Herzog's evaluation gives a primary diagnosis of post traumatic arthritis subtalor [sic] joint; post traumatic fracture left talus; and chronic bursitis, synovitis." (A.R. 426.) His treatment notes reflect conversations with Ankney in which he told her that her post-traumatic arthritis would be progressive and permanent and would likely result in the need for an ankle fusion. (Id. at 431.)

However, the two podiatrists who read Ankney's MRI opined that her MRI images raise a "*suspicion* of early developing posttraumatic degenerative" changes and that "continuing clinical and radiographic evaluation of the subtalar joint is necessary to determine the severity of the [degenerative joint disease]." (Id. at 435 (emphasis added).) These are considerably more tempered finding than those proffered by Dr. Herzog. Similarly, while Ankney contends that the MRI findings show "a well-defined stress fracture involving the clinical aspect of the tibia," the MRI report states that there is an "ill-defined" stress fracture. (A.R. 435; R. 24, Pl.'s Br. at 3.) Further, Dr. Carlos Smith—who examined Ankney in February of 2010 and suggested surgery (which never happened) to remove the screws and pins— limited the extent of his recommendations to those involving the hardware removal. As such, the record contains the findings of several other podiatrists who approached Ankney's ankle with substantially less alarm than Dr. Herzog.

Finally, even Dr. Herzog appeared unsure of his own diagnoses. His treatment notes exhaustively catalogue Ankney's subjective complaints of pain, but in the final analysis his medical opinions are peppered with conjecture: "[Ankney] *may* require a joint fusion in the future," (id. at 431 (emphasis added)), "it is *likely* that she *would* suffer from chronic pain," (id. (emphasis added)), she "*potentially could have* nerve damage," (id. (emphasis added)), it "*appears* her talus is collapsing," (id. at 432 (emphasis added)). Dr. Herzog's dire prognosis lacks certainty and does not find equal support in the medical record. *See* SSR 96-2p, 1996 WL 374188 at * 2 (July 2, 1996) ("It is an error to give an opinion controlling weight simply because it is the opinion of a treating source if it is not well-supported by medically acceptable clinical and laboratory diagnostic techniques . . . or other substantial evidence in the case record.").

Nor does the court find error with the ALJ's observation that Dr. Herzog's report intrudes into the Commissioner's decision-making power. The Social Security regulations at play here make clear that "[m]edical source opinions on issues reserved to the Commissioner," such as opinions "that are dispositive of a case, *i.e.*, that would direct the determination or decision of disability," are not really medical opinions at all and are not entitled to consideration. 20 C.F.R. § 404.1527(e). As the ALJ notes, Dr. Herzog was entitled to make determinations regarding the nature and severity of Ankney's impairments, including whether they meet the requirements of any listings, but his determination that Ankney "is unable to work in any job currently" is akin to stating that she is disabled. (A.R. 429.) This

constitutes an intrusion into the ALJ's domain and thus was a legitimate basis upon which the ALJ minimized the weight given to Dr. Herzog's report. In sum, the ALJ had ample grounds on which to afford Dr. Herzog's opinion lesser weight, and the court finds that he minimally articulated his reasons for doing so. *See Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000) (stating that "an ALJ must 'minimally articulate his reasons for crediting or rejecting evidence of disability'") (citations omitted).

## B.     Dr. McIlduff's Opinion

Dr. McIlduff's Mental Residual Functional Capacity Questionnaire concluded that Ankney suffers marked restrictions in daily living, social functioning, and concentration, persistence, and pace and that, as a consequence, she would be absent from work four or more days a month. (A.R. 322.) Per the VE's testimony, this number of absences would preclude employment. (Id. at 66-67.) The ALJ disagreed. After briefly summarizing some of Dr. McIlduff's main findings, he concluded that upon "reviewing the entire record and observing the claimant, the undersigned disagrees with Dr. McIlduff and accords her opinion little weight." (Id.) The ALJ then went on to similarly summarize Dr. Balunas's opinion (that Ankney is capable of unskilled work involving one and two-step instructions) and to then accord it "great weight" based "on the entire record and observing the claimant." (Id. at 21.) Ankney contends that the ALJ erred in failing to accord Dr. McIlduff's opinion controlling weight. The Commissioner counters that the ALJ reasonably adopted Dr. Balunas's report over Dr. McIlduff's.

As stated above with regard to Dr. Herzog, a treating source opinion is entitled to controlling weight, provided it is well-supported by "medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the case record. *See* 20 C.F.R. § 404.1527(d)(2). Dr. McIlduff qualifies as a treating source—she saw Ankney more or less monthly over the course of a year. Still, the ALJ was entitled to discount Dr. McIlduff's medical opinion, provided he offered "good reasons" for doing so. *See Punzio v. Astrue*, 630 F.3d 704, 710 (7th Cir. 2011). In this case, however, the ALJ did not offer any concrete reasons for rejecting Dr. McIlduff's opinion in favor of the findings of a non-treating and non-examining psychologist, Dr. Balunas. The ALJ did not minimally examine the length, nature, and extent of the treatment relationship, *see* 20 C.F.R. § 404.1527(d)(2)(i)-(ii), nor did he discuss whether Dr. McIlduff supported her opinions with sufficient explanations, *see id.* at § 404.1527(d)(3); *see also Larson v. Astrue*, 615 F.3d 744, 751 (7th Cir. 2010) (finding that "[e]ven if the ALJ had articulated good reasons for rejecting [the treating source's] opinion, it still would have been necessary to determine what weight his opinion was due under the applicable regulations"). Here, the ALJ did not describe or explain what he observed about Ankney during the hearing that affected his decision, gave him cause to discount Dr. McIlduff, or inclined him to adopt Dr. Balunas's report instead. He did not articulate what components of "the entire record" he found determinative. He did not specifically analyze any of the other

examining psychologists' reports, including those of Dr. Fabiano, Dr. Geiger, or Dr. Varghese, for purposes of minimizing Dr. McIlduff's opinions.

The problem with the ALJ's generalized determination as it pertains to Dr. McIlduff is that it provides the court with little to grasp. Five psychologists examined Ankney, but the ALJ only gave weight to the one non-examining psychologist, and he did so without providing the court with any insight into this decision. *See Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003) (holding that "[a]n ALJ can reject an examining physician's opinion only for reasons supported by substantial evidence in the record; a contradictory opinion of a non-examining physician does not, by itself, suffice"). The record paints a varied picture of a troubled young woman who has struggled much of her life with drug addiction and mental illness, as well as from serious injuries sustained in a car accident. The record contains at times contradictory accounts of whether, and to what extent, Ankney is able to navigate the world at large. By many accounts she is angry, depressed, anxious, and poor at interacting with others, and yet at times she has been observed as alert, pleasant, oriented, well-groomed, well-nourished, and even future-oriented. At times her story has changed, as with Dr. Pareja when she denied suffering from anything other than depression. (A.R. 420.)

Dr. Balunas and Dr. Varghese provide a less pessimistic picture of Ankney's prognosis, but there is no consensus: Dr. McIlduff found her unable to work, while Dr. Geiger listed her prognosis as "guarded," did not believe her able to manage her benefit fund, and believed her to be "depressed, anxious, angry and emotionally

flat." (Id. at 279.) Dr. Fabiano scored Ankney's IQ at 75 and noted "significant limitations across all areas of intellectual functioning." (Id. at 273.) Ultimately, the question of whether these other reports, along with Dr. Balunas's, support or refute Dr. McIlduff's opinion is a matter for the ALJ to articulate more clearly on remand so as to build a logical bridge between the evidence and his conclusion that Dr. McIlduff's opinion inaccurately reflects Ankney's capacity. As things now stand, the ALJ's decision to reject Dr. McIlduff's opinion is too poorly articulated to enable meaningful review. *See Kastner v. Astrue*, 697 F.3d 642, 646 (7th Cir. 2012) (finding that "[i]f a decision 'lacks evidentiary support or is so poorly articulated as to prevent meaningful review,' a remand is required").

C.    **The RFC Determination**

Ankney also challenges the ALJ's finding that she is capable of performing light work with certain postural limitations. Specifically, the ALJ found that she has the RFC to perform light work, except that she "can only stand/walk for about four hours in an eight-hour workday; is unable to understand, remember, and carry-out detailed and complex job instructions; is unsuited for work requiring intense focus and concentration for extended periods; i[s] moderately limited in the ability to respond appropriately to changes in the work setting; and is limited to only occasional contact with the general public." (A.R. 16.) Ankney argues that the ALJ's determination fails to abide by SSR 96-8p, which requires an assessment to "include a narrative discussion describing how the evidence supports each conclusion, citing

specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." *See* SSR 96-8p, 1996 WL 374184 at *7 (July 2, 1996).

The court agrees that the physical component of the RFC determination, meaning Ankney's ability to do light work and to stand/walk for four hours out of an eight-hour workday, cannot endure because it lacks an evidentiary basis. *See Briscoe ex. rel. v. Barnhart,* 425 F.3d 345, 351 (7th Cir. 2005). Without Dr. Herzog's report to rely upon, the ALJ was left with an evidentiary deficit as to Ankney's physical capabilities. He tried to fill this gap with the findings of Dr. Geiger, who opined in September 2008 that Ankney had a "normal gait and posture," but this observation was rendered a month before Ankney's car accident and thus is hardly indicative of her current capabilities. Moreover, Dr. Geiger is a psychologist, not a medical doctor or podiatrist. Accordingly, the ALJ's determination that Ankney has the RFC to perform light work and to stand/walk for four hours out of an eight-hour workday rests only upon his own lay opinions as to what Ankney is able to do. But an ALJ may not "play doctor" and use his own lay opinions to fill in evidentiary gaps in the record. *See Myles v. Astrue,* 582 F.3d 672, 677 (7th Cir. 2009); *see also Scott v. Astrue,* 647 F.3d 734, 741 (7th Cir. 2011) (finding that the ALJ did not identify any medical evidence supporting the belief that the claimant could stand for six hours). The court notes that while Ankney bears the burden of establishing the medical record, the ALJ is charged with a duty to develop the record and recognize the need for further medical evaluations before rendering his RFC and disability determinations. *Id.* The ALJ failed to build the requisite logical bridge

between the evidence and his conclusion that Ankney can do light work and stand for four hours out of an eight-hour workday.

As for the remaining portions of the RFC—those dealing with Ankney's emotional and intellectual capabilities—these too must fail for lack of sufficient analysis. The Social Security regulations make clear that an RFC assessment "must be based on *all* of the relevant evidence in the case record," including medical history, laboratory findings, effects of treatment, reports of daily living, effects of symptoms, and evidence from attempts to work. SSR 96-8p at *5. This was not done here. Dr. McIlduff's opinion was given little weight, but no specific reason was given for this conclusion other than the ALJ's disagreement with her findings and his reliance on the "repeated findings of [other] mental status examinations"—none of which was specifically identified, analyzed, and/or compared to Dr. McIlduff's. Dr. Balunas's report was given great weight, but the reason for this likewise was not specifically explained. No mention was made of Ankney's testimony, including her reports of daily living or her complaints of panic attacks, sleeplessness, racing thoughts, depression, and social anxiety. The ALJ does mention "a lack of intensive psychotherapy" as a reason for his determination, and the court agrees that several of Ankney's doctors recommended therapy, but this alone does not cure the overall paucity of analysis. Further, the record shows that Ankney was on a wait list for a period of time awaiting assignment of a therapist and that, once she received an assignment, she was unable to begin her sessions because she lacked transportation. *See* SSR 96-7p, 1996 WL 374186, at *7 (July 2, 1996) (an ALJ "must

not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment" without considering explanations the individual may provide). Because the ALJ's RFC analysis fails to satisfy the substantial evidence standard, this matter must be remanded for further evaluation. *See McKinzey*, 641 F.3d at 889.

## D. Ankney's Credibility

Finally, Ankney argues that the ALJ improperly assessed her credibility by resorting to boilerplate language[5] and then relying unduly on statements about her drug use and legal history. The Commissioner argues that the ALJ's credibility finding was properly premised on the fact that Ankney not only is a "convicted liar, but also that she lied about it." (R. 29, Def.'s Br. at 5.) The relevant issue here is whether the ALJ offered reasons grounded in evidence to explain his determination that Ankney lacks credibility. Ankney has a particularly high hurdle to overcome here because this court may only overturn an ALJ's credibility assessment if it is "patently wrong." *See Skarbek*, 390 F.3d at 504-05. That means that this court will not substitute its judgment regarding the claimant's credibility for the ALJ's, and Ankney "must do more than point to a different conclusion that the ALJ could have reached." *See Jones v. Astrue*, 623 F.3d 1155, 1162 (7th Cir. 2010).

---

[5] The Seventh Circuit has made it clear that an ALJ's use of the objectionable boilerplate language does not amount to reversible error if he "otherwise points to information that justifies his credibility determination." *See Pepper*, 712 F.3d at 367-68. Accordingly, there is no need to reverse based on an ALJ's use of this boilerplate where he gave other reasons, grounded in evidence, to explain his credibility determination. *See Filus v. Astrue*, 694 F.3d 863, 868 (7th Cir. 2012).

The ALJ found Ankney to lack credibility because of "the evidence of drug use, which she denied at the hearing but which she reported to the consultative examiner" and "although [she] said that her only legal involvement had been an arrest for shoplifting at age fifteen, she told the consultative examiner that she had been arrested for perjury and fraud in 2003 when she was in her twenties." (A.R. 21.) The ALJ was free to make a credibility determination regarding Ankney's believability, and his finding that she lacked veracity because she was untruthful at the hearing about her drug problems and criminal history was not "patently wrong." That being said, to fully evaluate Ankney's credibility, the ALJ also "must consider the entire case record and give specific reasons for the weight given to the individual's statements," including her symptoms and complaints of pain. SSR 96-7p at *4; *see also* 20 C.F.R. § 404.1529(a). Given that this case is being remanded for further development of the ALJ's opinion, the court recommends that the ALJ flesh out his credibility determination to include an analysis of Ankney's complaints of pain and other symptoms "to determine the extent to which the symptoms affect [her] ability to do basic work activities." SSR 96-7p, 1996 WL 374186, at *1.

## Conclusion

For the foregoing reasons, Ankney's motion for summary judgment is granted to the extent that this matter is remanded for further proceedings, and the Commissioner's cross-motion for summary judgment is denied.

**ENTER:**

_____
**Young B. Kim**
**United States Magistrate Judge**